## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SAMUEL STOKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-828-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Samuel Stokes ("Stokes"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Stokes appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Stokes was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the hearing before the ALJ on November 16, 2009, Stokes was 44 years old.  (R. 65).  Stokes testified that he graduated from high school and had two years of college, obtaining a technical certificate as an auto mechanic.  (R. 66).  He testified that he had worked as temporary labor over the years.  (R. 67).

Stokes testified that he could not keep a job.  (R. 69-70).  He said that his main problem was mental, and he testified that he could not comprehend simple instructions.  (R. 70).  He said that he became aggravated and then would "take it out" on his coworkers or supervisors.  *Id.*

He said that his problems with anger were not confined to the workplace, and he testified that he couldn't get along with anyone.  (R. 71).  He testified that he was receiving medications from Family & Children's Services ("F&CS") and that he had been diagnosed with bipolar disorder.  *Id.*  He said that the manic part of the disorder caused him to be unreasonably irritable and the depressed part of the disorder caused him to have suicidal thoughts and to be unable to get out of bed.  *Id.*  He said that he had attempted suicide eleven times.  (R. 71-72).

Stokes said that the medication that he was given kept him "zonked out."  (R. 72).  He said that the mood swings of his illness would cause him to be awake for three days, or sleep for three days.  *Id.*  He said that he could not function normally.  *Id.*  He typically would be awake for hours when he went to bed at 10 p.m., dropping off to sleep around 3:00 a.m.  (R. 73).  When he woke, he would not feel alert or awake.  *Id.*  He had trouble remembering appointments, and he had no energy.  *Id.*  One problem with his sleep was racing thoughts.  (R. 74).  If he didn't have medication, he felt as though he would never sleep.  *Id.*

Stokes testified that he had been shot in the back with a pellet gun and still had pellets in his leg.  (R. 75).  He said that he had previously been on disability for 20 years.  (R. 77).

The administrative transcript includes records from the Texas Department of Criminal Justice reflecting an apparent 30-day prison stay by Stokes in September 2006.  (R. 310-31).  The medical records for the most part are routine screening documents on intake into the prison system.  *Id.*

The administrative transcript contains records from the Oklahoma Department of Corrections ("DOC") beginning on December 1, 2006.  (R. 406).  The assessment done at that time was that Stokes had personality disorder not otherwise specified, and no medications were ordered.  *Id.*  Another interview on January 22, 2007 resulted in an assessment of antisocial personality disorder.  *Id.*  Stokes was observed on several occasions in April 2007 with manic and paranoid behavior.  (R. 405).  He refused medications.  *Id.*  He was seen on May 8, 2007, and he asked for medications, but the DOC employee[1] believed that he was "drug seeking" and did not need medications.  (R. 404).  He continued to be diagnosed with antisocial personality disorder.  *Id.*

On June 5, 2007, Stokes was assessed with psychosis disorder not otherwise specified, and he was prescribed Seroquel.  (R. 403).  On June 11, 2007, an employee diagnosed Stokes with antisocial personality disorder with a note to rule out psychosis not otherwise specified.  (R. 402).  It was noted that Stokes appeared paranoid and spoke of conspiracies against him.  *Id.*  The next day, the note regarding Stokes' assessment was to rule out delusional disorder.  *Id.*

On August 6, 2007, Stokes told a DOC employee that he was suicidal and needed to be watched.  (R. 400).  A note states that Stokes had been refusing to take his Seroquel and the DOC had discontinued it since July 21, 2007 due to his noncompliance.  *Id.*  Stokes refused to speak to the medical professional.  *Id.*  On August 9, 2007, it was noted that Stokes' delusional ideation had increased.  (R. 399).

---

[1]From the DOC records, it is difficult to ascertain the identity and credentials of the employees who made the notes in Stokes' records.  (R. 332-406).

On September 26, 2007, Stokes reported that he had intentionally taken 10-15 benadryl tablets. (R. 344). He stated that this was the only way for him to be sent to the "SHU."[2] *Id.* Stokes refused to go to the hospital, and instead he was monitored every 30 minutes. (R. 342-44).

On October 12, 2007, a note was made that Stokes had again threatened suicide. (R. 393). The note appears to reflect that the threat was considered by DOC employees to be an attempt by Stokes to be transferred to a private cell. *Id.* He was assessed as malingering. (R. 392). Later in October, Stokes was assessed with bipolar disorder and prescribed Seroquel. (R. 391). On November 9, 2007, a note again states that Stokes was threatening suicide and was angry that he had been placed in the general population. (R. 388). His assessment was stated as antisocial personality disorder. *Id.*

In December 2007, Stokes was prescribed Trazadone at his request, and other medications were discontinued. (R. 384). He was assessed with depressive disorder not otherwise specified. *Id.* Between December 2007 and February 22, 2008, Stokes made several threats of suicide and was housed in a single cell. (R. 356-358, 375-83).

In January, 2008, Stokes complained of back pain and was given pain medication. (R. 339). He took four times as much as prescribed and argued with the provider about the dosage. *Id.*

It appears that Stokes was released from DOC custody on February 22, 2008. (R. 356).

Stokes presented to the emergency room at Oklahoma State University Medical Center on March 28, 2008. (R. 407). He stated that he had just gotten out of jail and could not see his

---

[2]Presumably, "SHU" was the abbreviation for Special Housing Unit. *See, e.g. Jordan v. Sosa,* 654 F.3d 1012, 1021 (10th Cir. 2011).

physician until April 13, and he asked for Lortab and narcotic cough medication.  *Id.*  The attending physician informed him that he would not prescribe narcotics and offered alternative medications.  *Id.*  Stokes left without an examination or treatment.  *Id.*

Stokes was seen at Parkside Psychiatric Hospital & Clinic ("Parkside") on April 23, 2008 for an initial assessment.  (R. 408-22).  Regarding Stokes' history of inpatient treatment, he reported that he had been hospitalized on multiple occasions for suicide attempts.  (R. 415).  He reported that after he was released from prison he had fought with his girlfriend and had been kicked out of the house several times.  (R. 417).  The night previous to the assessment, the police had been called, and he had been transported to his mother's house.  *Id.*  On Axis I[3], Stokes was diagnosed with a mood disorder, not otherwise specified.  (R. 418).  Axis II was deferred, and his global assessment of functioning ("GAF")[4] was stated as currently 50, highest past year 55.  *Id.* For the mental status exam, Stokes was assessed in most areas as being within normal limits.  (R. 419-22).  Stokes was assessed as having impaired judgment and superficial insight.  (R. 422).

The administrative transcript includes a treatment plan with F&CS that states that it was electronically signed by a clinician on June 23, 2009.  (R. 449-53).  Stokes reported his history of

---

[3]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) ("DSM-IV").

[4]The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.   A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

prior inpatient and outpatient mental health treatment.  (R. 452).  He reported symptoms of depression, difficulty sleeping, homicidal ideation, and racing thoughts.  *Id.*

Stokes was seen at F&CS on July 6, 2009 for pharmacological management.  (R. 454-55).  His Axis I diagnoses were bipolar I disorder, most recent episode mixed, moderate, without psychosis, and post-traumatic stress disorder ("PTSD").  (R. 455).  His GAF was stated as 55-65.  *Id.*  He was prescribed Invega and Remeron.  *Id.*  On July 16, 2009, Stokes was seen by a case manager, and he was assisted with a housing application.  (R 456).  Stokes was seen again on August 5, 2009 by a case manager for additional help regarding housing, medications, and his Social Security disability application.  (R. 457).

Stokes was seen for pharmacological management at F&CS on January 27, 2010.  (R. 34).  The attending physician noted that Stokes had not returned for appointments since July 2009 and was experiencing manic symptoms.  *Id.*  The diagnosis was bipolar I disorder, most recent episode manic, moderate.  *Id.*  There was a note to rule out schizoaffective disorder, and a note of PTSD by history.  *Id.*

The F&CS documents contain a treatment plan that states that it covered the period of January 26, 2010 through July 25, 2010.  (R. 37-45).  It appears to have been electronically signed by Stokes' case worker and by a licensed practical counselor on March 3, 2010.  (R. 43, 45).  There is no indication that the treatment plan was signed by a medical doctor or by Stokes.  (R. 37-45).  The treatment plan states Stokes' Axis I diagnosis as schizoaffective disorder.  (R. 44).  It states Stokes' GAF as 50, but then states that his highest GAF level in the last year was 32.  (R. 45).

Stokes was seen at Hillcrest Medical Center on July 28, 2010 for low back pain after he was taken there by ambulance.  (R. 7-30).  Stokes reported that he had jumped down a flight of

stairs in trying to avoid wasps.  (R. 10).  Physical examination showed paravertebral spasms.  *Id.*
X-rays showed no evidence of acute fracture, and Stokes was discharged.  (R. 11).

Stokes was seen for a mental status examination by agency consultant Stephanie C. Crall,
Ph.D. on May 29, 2008.  (R. 423-27).  Stokes gave his mental health history as including
diagnoses for bipolar disorder and schizophrenia.  (R. 423).  He reported symptoms of depression
including sleep disturbance, poor concentration, low energy, loss of interest in previously
enjoyed activities, a tendency to become easily agitated, and feelings of worthlessness.  *Id.*  He
stated that he had previously attempted suicide nine times.  *Id.*  He said that he had an occasional
ability to control the weather and to see dark auras surrounding evil people.  (R. 423-24).  He was
not taking prescription medications or participating in counseling services at the time of the
assessment.  (R. 424).  Dr. Crall gave as her opinion that Stokes' "ability to engage in work-
related mental activities, such as sustaining attention, understanding, and remembering and to
persist at such activities was likely adequate for simple and some complex tasks."  *Id.*  Dr. Crall
indicated that her diagnoses were based on Stokes' recounting of his history.  (R. 425).  Her Axis
I diagnoses were bipolar disorder and delusional disorder.  (R. 426).  On Axis II she stated: "No
Diagnosis, Features of Antisocial Personality Disorder."  *Id.*

Agency nonexamining consultant Dorothy Millican-Wynn, Ph.D., completed a
Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on
June 26, 2008.  (R. 339-52).  For Listings 12.02, 12.04, and 12.08, Dr. Millican-Wynn noted
Stokes' delusional disorder, bipolar disorder, and antisocial personality disorder.  (R. 433, 435,
439).  For the "Paragraph B Criteria,"[5] Dr. Millican-Wynn found that Stokes had moderate

---

[5]There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment. The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)

restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 442).  In the "Consultant's Notes" portion of the form, Dr. Millican-Wynn summarized the report of Dr. Crall and some of the DOC records regarding Stokes' mental health.  (R. 444).  She gave a brief summary of Stokes' activities of daily living.  *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Millican-Wynn indicated that Stokes was markedly limited in his ability to understand, remember, and carry out detailed instructions.  (R. 428).  She also found a marked limitation in the ability of Stokes to interact appropriately with the general public.  (R. 429).  She found no other significant limitations.  (R. 428-29).  In her narrative summary, Dr. Millican-Wynn stated that Stokes could perform simple tasks with routine supervision.  (R. 430).  Stokes could relate to supervisors and peers on a superficial work basis, but he could not relate to the general public.  *Id.*  He could adapt to a work situation.  *Id.*

## Procedural History

Stokes filed an application on February 28, 2008, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq.*  (R. 124-29).  The application was denied initially and on reconsideration.  (R. 90-96).  A hearing before ALJ Charles Headrick was held November 16, 2009 in Tulsa, Oklahoma.  (R. 61-87).  By decision dated January 22, 2010, the ALJ found that Stokes was not disabled.  (R. 52-57).  On November 2, 2010, the Appeals Council  denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents

---

difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

the Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[6]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

_____

[6]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

9

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Stokes had not engaged in any substantial gainful activity since his application date of February 28, 2008.  (R. 54).  At Step Two, the ALJ found that Stokes had a severe impairment of bipolar disorder.  *Id.*  At Step Three, the ALJ found that Stokes' impairment did not meet any Listing.  (R. 54-55).

In his RFC determination, the ALJ found that Stokes had the RFC to perform the full range of work at all exertional levels "with the following nonexertional limitations: he can perform only simple tasks with superficial contact with supervisors and peers, and only minimal contact with the general public."  (R. 55).  At Step Four, the ALJ found that Stokes had no past relevant work.  (R. 56).  At Step Five, the ALJ found that there were jobs in significant numbers that Stokes could perform considering his RFC, age, education, and work experience.  *Id.* Therefore, the ALJ found that Stokes was not disabled since the application date.  (R. 57).

**Review**

Stokes raises issues regarding the ALJ's Step Four and Step Five determinations, his evaluation of the medical source evidence, and his credibility assessment.  Regarding the issues raised by Stokes, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

Before discussing the merits of the issues raised by Stokes, the Court notes the requirements of a claimant in articulating his arguments before this Court.  These requirements were discussed by the majority in the Tenth Circuit case of *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).  In *Wall*, the court discussed an argument related to the claimant's RFC.  *Id.* The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence.  *Id.*  The appellate court cited to the opinion of the district court judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived."  *Id.*  The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue.  *Id.* (quotation and citation omitted).  *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011) (Tenth Circuit's review is limited to issues the claimant preserved at the district court level and adequately presented on appeal).

**Step Four and Five Issues**

Over the span of one-and-one-half pages of Plaintiff's Opening Brief, Stokes strings together several sentences that purport to make arguments regarding errors of the ALJ at Steps Four and Five.  Plaintiff's Opening Brief, Dkt. #12, pp. 2-3.  The undersigned finds that these arguments are perfunctory and not sufficiently developed to allow meaningful analysis.  They are

therefore waived.  *Wall*, 561 F.3d at 1066.

Even without a finding that these arguments are waived, they are not persuasive.  First, while Stokes includes Step Four in this section of the brief, the ALJ found that Stokes had no past relevant work, and therefore he proceeded to Step Five.  (R. 56).  Stokes is not arguing that the ALJ erred in finding that he had no past relevant work, and his many references to Step Four in this context are nonsensical.  *See Krauser*, 638 F.3d at 1333 (argument was "meritless" because counsel misunderstood distinction between Step Four and Step Five analysis).

Stokes opens this section of his brief by citing to legal principles that the ALJ must articulate a proper hypothetical to the VE and that it must be precise.  He then states that the ALJ failed to cite the strength demands in his hypothetical.  This is not true, because the ALJ stated in his hypothetical that the individual had the capacity to perform a full range of medium work.  (R. 83-84).  The exertional requirements of medium work are defined at 20 C.F.R. § 416.967(c).  The Tenth Circuit has affirmed cases where this method, using one of the defined exertional levels as part of the hypothetical asked of the VE, was used.  *Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished); *Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th Cir. 2000).  The additional sentences of this argument by Stokes appear to address the same theme.  Stokes, without elaboration, proclaims that the hypothetical must be full, the RFC "is a function by function assessment," the ALJ cannot ignore his own rulings, and there is nothing to review when the decision occurs in the head of the VE.  Plaintiff's Opening Brief, Dkt. #12, p. 2.  While all of these principles may be true and applicable in certain circumstances, Stokes makes no attempt to explain how they are applicable to this case, and the undersigned finds that they are not applicable here.

Stokes also complains that the hypothetical to the VE did not match the RFC determination because the hypothetical asked the VE to consider someone who could do the full range of medium work, while the ALJ found that Stokes could do work at all exertional levels. Plaintiff's Opening Brief, Dkt. #12, p. 3.  Hypothetical questions to the VE must include all limitations found by the ALJ in the RFC determination, but here the hypothetical was more restrictive than the RFC determination.  *See Darland v. Shalala*, 52 F.3d 337 *2 (10th Cir. 1995) (unpublished) (VE testimony regarding sedentary jobs alone was substantial evidence supporting ALJ's Step Five determination, and therefore court did not need to address whether RFC that included light work was in error).  The VE's testimony, based on an exertional level limited to medium work, remains substantial evidence supporting the ALJ's Step Five finding even when the ultimate RFC determination was that Stokes could do all exertional levels of work.

The undersigned finds no error at Step Four or Step Five of the ALJ's decision.

**Medical Evidence**

This section of Stokes' brief consists of a string of sentences that are only tangentially related to each other.  Plaintiff's Opening Brief, Dkt. #12, pp. 3-5.  These arguments are perfunctory and deprive the Court of the ability to meaningfully analyze them.  They are therefore waived.  *Wall*, 561 F.3d at 1066.

Even without finding these arguments are waived, the Court would find them unavailing. The general theme of the first paragraph of this argument is that the ALJ failed to weigh the medical opinion evidence.  Stokes gives no examples of what evidence should have been, but was not, considered by the ALJ.  In his decision, the ALJ cited to the statement by examining consultant Dr. Crall that Stokes' mental ability to do work activities was adequate for simple tasks.  (R. 56).  He also cited to the reports of the non-examining consultants finding that Stokes

could do simple tasks and relate to supervisors and peers on a superficial basis, with minimal

contact with the public.  *Id.*  "When the ALJ does not need to reject or weigh evidence

unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened."

*Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); *Lauxman v. Astrue*, 321 Fed. Appx.

766, 768-69 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had

elaborated" on his analysis of the opinion evidence, his decision was adequate).  Here, the

opinion expressed by Dr. Crall in her report was consistent with the conclusions of Dr. Millican-

Wynn.  There was no opinion evidence from any treating physician, and Stokes does not cite to

any.  Given the consistency of the evidence, the ALJ's discussion of that evidence is sufficient,

and his reasoning in formulating his RFC determination is clear.

Stokes' next argument is difficult to decipher, but it appears to be that Dr. Millican-

Wynn's opinion evidence was internally inconsistent because she found that Stokes had

moderate difficulties in maintaining concentration, persistence, or pace in the Psychiatric Review

Technique Form, while finding no significant limitation in Stokes' ability to maintain attention

and concentration for extended periods on the Mental Residual Functional Capacity Assessment

form.  (R. 428, 442).  The undersigned has considered an identical argument in some detail in a

recent decision.  *Wilson v. Astrue*, ___ F. Supp. 2d ___, 2011 WL 5999867 at *8 (N.D. Okla.).

The undersigned adopts the portion of *Wilson* that addresses this argument and finds it

unnecessary to repeat that discussion here.  Stokes' contention has no merit.  *See Norris v.*

*Barnhart*, 197 Fed. Appx. 771, 775-76 (10th Cir. 2006) (unpublished) (opinion that the claimant

was not significantly limited in her ability to maintain socially appropriate behavior did not

conflict with opinion that she was moderately limited in her ability to interact appropriately with

the general public).

Stokes argues that the ALJ's RFC did not include any limitations related to his moderate restriction of activities of daily living.  Plaintiff's Opening Brief, Dkt. #12, p. 4.  The Paragraph B finding that Stokes had a moderate restriction in his activities of daily living was one of the four broad categories in the Psychiatric Technique Review form.  (R. 442).  Stokes does not explain what functional limitations corresponding to this broad general finding related to activities of daily living should have been found by the consulting experts or by the ALJ in his RFC determination.   The same expert, Dr. Millican-Wynn, who found the moderate restriction of Stokes' activities of daily living then determined his functional limitations on the Mental Residual Functional Capacity Assessment form.  (R. 339-52).  The ALJ relied on that expert opinion in formulating his RFC determination, and therefore it is supported by substantial evidence.  *See Barber v. Astrue*, 431 Fed. Appx. 709, 712-13 (10th Cir. 2011) (unpublished) (even though ALJ found that the claimant's activities of daily living were only mildly restricted, when the expert found they were moderately limited, there was no error when the ALJ relied on the expert's functional limitations in making his final RFC determination).  Stokes' argument does not illustrate any error by the ALJ.

In this section of his brief ostensibly related to the ALJ's evaluation of the opinion evidence, Stokes adds a short argument that Dr. Crall should have had Stokes' DOC records for her review because then "she could have reasonably determined that he could not function in a job."  Plaintiff's Opening Brief, Dkt. #12, pp. 4-5.  Stokes cites to no authority that would support his implied argument that it was reversible error for the ALJ to rely upon the opinion of an examining consultant who did not have all of the claimant's medical records before her.  As the Tenth Circuit has noted,  "[a] party's failure to cite any authority 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'"  *Flores v.*

*Astrue*, 246 Fed. Appx. 540, 543 (10th Cir. 2007) (unpublished), *quoting Rapid Transit Lines,*

*Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970).   Additionally, Stokes was

represented by counsel at the hearing.   At the end of the hearing, that attorney suggested that

"more testing might be in order," but he did not specify that there was a problem with Dr. Crall's

report because she did not have Stokes' records available when she wrote it.  (R. 85-86).  When a

claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and

present the claimant's case.  *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997).  The

ALJ committed no reversible error in failing to order more testing or in relying upon Dr. Crall's

report.

The ALJ did not commit any reversible error in his consideration of the medical evidence.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ found that Stokes' statements "are not credible to the extent they

are inconsistent with the above residual functional capacity assessment."[7]  (R. 56).  The ALJ's

---

[7]Stokes faulted this language as meaningless boilerplate, but this sentence was merely an
introduction to the ALJ's analysis and was not harmful.  *See Kruse v. Astrue*, 2011 WL 3648131
at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility
determination only in the absence of a more thorough analysis").

first specific reason for his credibility finding was Stokes' lack of diligence in seeking treatment. *Id.* The failure to be diligent in seeking treatment for an impairment that the claimant asserts is disabling is a legitimate factor for the ALJ to cite in making a credibility assessment. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000); *Foy v. Barnhart*, 139 Fed. Appx. 39, 43 (10th Cir. 2005) ("[Claimant's] failure to avail herself of available therapeutic treatment is a legitimate factor to be considered in evaluating the severity of her alleged mental limitations.").

In his discussion of Stokes' credibility, the ALJ also noted that no treating physician had placed functional restrictions on Stokes that would interfere with his ability to work.  (R. 56). The ALJ stated that Stokes' "daily activities are consistent with the performance of work because he looks for work." *Id.* The Tenth Circuit has affirmed decisions in which credibility was based in part on the fact that no treating physician had placed restrictions on the claimant. *See, e.g., Boswell v. Astrue,* 2011 WL 6188724 at *2 (10th Cir.) (unpublished)*; Stokes v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).  The Tenth Circuit has also affirmed credibility findings that were in part based on the fact that the claimant looked for work even though she claimed she was disabled.  *See, e.g., Williams v. Barnhart,* 178 Fed. Appx. 785, 788-89 (10th Cir. 2006) (unpublished); *Qantu v. Barnhart*, 72 Fed. Appx. 807, 811 (10th Cir. 2003) (unpublished).  Thus, the ALJ here gave specific, legitimate reasons for his finding that Stokes was not fully credible.

Stokes argues that the ALJ's consideration of his looking for work as a factor in the ALJ's credibility assessment was in error.  As cited above, the Tenth Circuit has recognized that the ALJ can legitimately note that there is some inconsistency between claiming to be totally disabled and seeking employment.  Stokes testified that he had income, albeit limited, in 2008 because he took temporary work through a "labor pool."  (R. 67).  He then testified that he had

been looking for work and applying for jobs for the 18-month period before the hearing, but had not been hired.  (R. 68).  The ALJ could rightly view Stokes' attempt to obtain employment to be inconsistent with his claim that he is unable to work.

Stokes attacks the ALJ's consideration of his activities of daily living, but the undersigned finds that the ALJ did not rely upon "minimal" activities of daily living in making his credibility finding.  (R. 52-57).  The only statement made by the ALJ is the one quoted above, that Stokes' daily activities were consistent with work because he looked for work.  (R. 56).  As discussed, the ALJ was entitled to consider Stokes' efforts to obtain employment as being inconsistent with his claim of disability, thus reducing his credibility.  The remainder of Stokes' arguments relating to activities of daily living are not on point.

Stokes complains that the fact that his treating physicians have not placed limitations on his activities does not mean that he is not disabled.  As discussed above, the Tenth Circuit has affirmed cases in which the ALJ's credibility assessment was in part based on the lack of treating physician restrictions.  While this factor alone would not have been sufficient to support an adverse credibility finding, here the ALJ also noted the very limited indications that Stokes has sought treatment for the mental impairments that he claims are disabling, as well as the inconsistency of that claim when Stokes is also looking for work.  The ALJ was entitled to note that none of Stokes' treating physicians had placed restrictions on his activities.

At this point, Stokes returns to the subject of the hypothetical to the VE, noting that it was for one set of restrictions while the RFC had a less restrictive range of activities not considered by the VE.  This argument has been discussed above in the section relating to the hypothetical to the VE, and the undersigned finds it to be out of place in a discussion of the ALJ's credibility assessment.  Stokes faults the ALJ for not citing to the prison notes that indicated that DOC

employees didn't believe that he was hallucinating and wrote that he was malingering, but also treated him with antipsychotic medications.  Stokes also faults the ALJ for not noting that Dr. Crall, the consultative examiner, stated that Stokes appeared to be "open and honest" during her evaluation.  A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence." *Stokes*, 274 Fed. Appx. at 685-86.  The Tenth Circuit said that the only question they needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion." *Id.* at 686.  The Tenth Circuit found no reason to overturn the ALJ's credibility determination.  *Id.*  This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Stokes was not fully credible.

Stokes then attacks the ALJ's finding that he did not diligently seek treatment for the mental conditions that he claims are disabling.  Stokes first states that the ALJ failed to ask him at the hearing about his failure to return to Parkside.  He then states that he testified at the hearing that he could not receive treatment due to lack of money, and he argues that the ALJ then had to address whether financial inability was the reason why he did not seek treatment.  Plaintiff's Opening Brief, Dkt. #12, pp. 7-8.  There are a few problems with this approach.  First, Stokes' counsel did most of the questioning at the hearing.  (R. 70-80).  He could have further developed whether lack of money was what kept Stokes from consistently seeking treatment during the relevant period.  As stated above, the ALJ can ordinarily rely on counsel to structure and present the claimant's case.  *Hawkins*, 113 F.3d at 1166-67.  Second, Stokes did testify that F&CS had group therapy and "other things" that he couldn't participate in because he had no money, no Medicaid, and no insurance.  (R. 77-78).  However, he had earlier testified that he received

medications from F&CS, and in that testimony he did not state that the physician or the

medications were unavailable to him due to financial considerations.  (R. 71).  The records from

F&CS do not indicate that Stokes would be turned away for failure to pay or that all services

were not available to him.  (R. 34-45, 449-57).[8]  At his initial pharmacological management

appointment with the physician at F&CS on July 6, 2009, Stokes was prescribed Invega and

Remeron.  (R. 454-55).  When he saw his case manager on August 5, 2009, he reported that he

had been compliant with his medication.  (R. 457).  There is then a gap until January 27, 2010,

when he presented to an F&CS physician having been off of medication for an undefined time.

(R. 34).  The physician noted that his only appointment with a physician had been in July and

Stokes "did not return for multiple scheduled [appointments] to restart [medications]."  *Id.*  The

physician again started Stokes with prescription medications to treat his mental conditions.  *Id.*

There was no reference to Stokes' ability to pay in this record, or any other record of F&CS.

Thus, the evidence reflects that Stokes was very sporadic in seeking treatment for the conditions

that he claims are disabling.  The evidence also reflects that F&CS was providing prescription

medication management services to Stokes without regard to his financial situation.  Thus,

Stokes' arguments related to his inability to pay miss the mark and do not undercut the ALJ's

reliance as part of his credibility assessment on Stokes' failure to consistently seek treatment for

his allegedly disabling mental conditions.

---

[8]The ALJ did not have the benefit of the records from F&CS showing that Stokes returned to F&CS on January 27, 2010.  (R. 34).  These additional documents were submitted by Stokes after the ALJ's decision.  This Court, however, has included the new evidence in its consideration of whether substantial evidence supports the ALJ's decision.  "[W]e must consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented."  *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

In his last paragraph relating to the issue of credibility, Stokes broadly stated that the ALJ's credibility assessment was not supported by substantial evidence and that it was nothing more than a conclusion in the guise of findings.  Plaintiff's Opening Brief, Dkt. #12, p. 8.  The Court rejects these broad statements and finds that the ALJ's credibility assessment was based on specific reasons that were closely linked to substantial evidence.  Stokes' arguments to the contrary are a request that this Court reweigh the evidence, and the Court must decline this invitation.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  The ALJ's credibility assessment is affirmed.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 2nd day of March, 2012.

Paul J. Cleary
United States Magistrate Judge